UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 18-80179-CR-COHN

UNITED STATES OF AMERICA

v.

ANTHONY MICHAEL D'AMICO,

Defendant.
_____/

## STIPULATED FACTUAL PROFFER

Were this case to proceed to trial, the parties agree that the Government would prove the following facts beyond a reasonable doubt:

Anthony Michael D'Amico ("D'AMICO"), did knowingly, and with intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, certain writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Sections 1343 and 2.

"Lead generation" was the initiation of consumer interest or enquiry into products or services of a business. Leads came from various sources or activities, for example, digitally via the Internet, through personal referrals, through telephone calls either by the business or telemarketers, through advertisements, and events. A lead generation business was a marketing company that acquired leads for specific customers.

Company 1 was a Delaware corporation doing business in Broward County, Florida, and

elsewhere, as a lead generation business. Company 1 sold leads to its customers, which were health insurance and other companies across the country. Each lead was a call from a potential health insurance seeker, which came through Company 1's proprietary computer system, Invoca, and was then routed to one of Company 1's customers. Each call was labeled with a unique telephone number corresponding to Company 1, the lead company which had routed the calls to the health insurance company. Customers generated a unique phone number to provide to Company 1 so that Company 1's health insurance company customers knew how much to pay Company 1 for generating the leads connecting them to health insurance seekers. Company 1's customers paid invoices to Company 1 based on the volume of leads that the customers received from Company 1's unique telephone number.

D'AMICO, a resident of Boca Raton, Florida, was a sales and marketing director at Company 1. D'AMICO previously worked at Company 2, a lead-generation business that was acquired by Company 1 in or around September 2017, and continued on with Company 1 after the acquisition. For the purposes of this statement, Company 1 includes its predecessor in interest, Company 2. At both Company 1 and Company 2, D'AMICO was responsible for assisting in the collections of accounts receivable from the customers he generated. D'AMICO had access to the Invoca system by virtue of his role as an employee.

Fuel Avenue, Inc. ("Fuel Avenue") was a Florida corporation, purporting to do business in Boca Raton, Florida as a lead generation service. Department of State, Division of Corporations records show that D'AMICO was the president and registered agent of Fuel Avenue. D'AMICO was also the sole signatory on Fuel Avenue's bank accounts.

Client 1, a Delaware corporation, was a company operating in the health insurance

2

industry. Client 1 was a customer that purchased leads from Company 1.

Client 2, a Florida corporation, was a marketing company. Client 2 was a customer that purchased leads from Company 1.

Investigation revealed that D'AMICO made false and fraudulent representations in order to reroute leads, and proceeds from the sale of those leads, from Company 1 to accounts under his own control. Specifically, D'AMICO used his access to Company 1's Invoca system to divert thousands of leads from Company 1 by changing the unique phone numbers associated with Company 1 to correspond to the unique number provided by purported clients to his recently-created purported lead generation company, Fuel Avenue, including Client 1 and Client 2.

D'AMICO then sent invoices to those customers, including Client 1 and Client 2, using, among other things, emails from Fuel Avenue. The customers then sent payment, via interstate wire, to D'AMICO, through Fuel Avenue.

Witness statements, bank statements, business records, and other evidence gathered during the investigation showed that eHealth Insurance Services ("eHealth") was a fictitious health care company that D'AMICO created in Company 1's Invoca system. The name for eHealth closely resembled other real customers of Company 1.

In particular, D'AMICO created an email address, and purchased a website domain, for a fictitious person purportedly named "Larry Thorpe," a supposed employee of eHealth. Business records established that the eHealth email account for "Larry Thorpe" was paid for using a credit card belonging to D'AMICO – indeed, the same credit card that D'AMICO used to pay for a website domain for Fuel Avenue, one of D'AMICO's other companies.

In some cases, D'AMICO diverted leads by rerouting them through eHealth, a fictitious

3

customer that he created in the Invoca system. D'AMICO directed health insurance leads to eHealth, and then changed the unique phone number associated with those leads to correspond to unique numbers associated with Fuel Avenue.

D'AMICO also created a fake contract between D'AMICO – on behalf of Company 1 – and eHealth, purportedly electronically signed by "Larry Thorpe." The purpose of this fake contract was to conceal that D'AMICO was using eHealth, a fake customer, to reroute leads away from Company 1, and money generated from sales of those leads, to himself.

When questioned by representatives from Company 1 regarding why insurance company customers, including eHealth, Client 1, and Client 2, were not paying their invoices for the leads from Company 1, D'AMICO falsely and fraudulently represented that he was working on this issue, and that the customers were planning to pay.

As a result of D'AMICO's participation in the wire fraud scheme, he and his accomplices caused fraudulent wire transfers to accounts under D'AMICO's control, as detailed below:

| | | |
|---|---|---|
| 1 | September 18, 2017 | Wire in the amount of $3,000 sent from Client 1 in Pennsylvania, to Fuel Avenue Inc., in Palm Beach County, in the Southern District of Florida |
| 2 | September 21, 2017 | Wire in the amount of $1,000 sent from Client 1 in Pennsylvania, to Fuel Avenue Inc., in Palm Beach County, in the Southern District of Florida |
| 3 | October 2, 2017 | Wire in the amount of $3,000 sent from Client 1 in Pennsylvania, to Fuel Avenue Inc., in Palm Beach County, in the Southern District of Florida |
| 4 | December 18, 2017 | Wire in the amount of $15,000 sent from Client 1 in Pennsylvania, to Fuel Avenue Inc., in Palm Beach County, in the Southern District of Florida |
| 5 | December 26, 2017 | Wire in the amount of $125,000 sent from Fuel Avenue Inc., in Palm Beach County, in the Southern District of Florida, to TD Bank, in Delaware |

In so doing, the Defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud.

4

The parties agree that these facts, which do not include all facts known to them, are sufficient to prove beyond a reasonable doubt her guilt with respect to Counts 1 through 5 of the Indictment.

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

Date: 2/14/19

By: _____
LISA H. MILLER
ASSISTANT UNITED STATES ATTORNEY

Date: 2/14/19

By: _____
MICHELLE SUSKAUER, ESQ.
ATTORNEY FOR DEFENDANT

Date: 2/13/19

By: _____
ANTHONY MICHAEL D'AMICO
DEFENDANT